James C. Hoskins, Appellant, v. Chicago Park District,
Appellee.

Gen. No. 41,594.

Heard in the first division of this
court for the first district at the February term, 1941.
Opinion filed June 30, 1941. Rehearing
denied July 14, 1941.

EDGAR A. JONAS and FREDERICK C. JONAS, both of
Chicago, for appellant; J. J. COOKE and JOHN A. Mc-
ELLIGOTT, both of Chicago, of counsel.

JOHN O. REES, of Chicago, for appellee; MARTIN G.
LOEFF and HARRY P. HENSEL, both of Chicago, of
counsel.

MR. JUSTICE O'CONNOR delivered the opinion of the
court.

Plaintiff (the lessee of certain real estate which lies
on the east and west sides and underneath the Outer

Drive viaduct and north of the bridge near the mouth of the Chicago River) filed his complaint in chancery against the Chicago Park District for a mandatory injunction to compel the removal of railings, pilasters, ornaments and trimmings which constitute the railings along the west side of the Outer Drive, so as to permit him to have free ingress and egress from the Drive to a building which he proposed to erect on the west side of the Drive. The building would have a direct frontage on the Drive of about 40 feet and about 65 feet on the south and west bordering on a plaza. The cost of the improvement, exclusive of land, was $11,400,000.

Defendant filed its answer denying plaintiff was entitled to the relief. The case was referred to a master in chancery who took the evidence, made up his report and found that the Outer Drive—the bridge and approaches—were a part of the boulevard connecting the parks located on the north and the south sides of the city and were "a part of the park system and do not constitute a public street or highway"; that plaintiff was guilty of laches in failing to bring his action while the approach and bridge were in the course of construction, and recommended the suit be dismissed for want of equity. After objections and exceptions were overruled, a decree was entered substantially in accordance with the recommendation of the master and plaintiff appeals.

The record discloses that the Outer Drive consists of an eight-lane roadway for vehicular travel commencing at Ohio street on the north. The roadway inclines from Ohio street until it reaches the Chicago River where it is about 38 feet above the ground. From that point south it declines until it reaches the level at Monroe street, a total distance from north to south, if the direction were straight, of a little less than a mile. But the roadway does not proceed in a straight direction. After the river is crossed from the

north, it turns to the west, a distance of approximately one and a half blocks, then turns directly south for about five blocks to Monroe street. The driveway then continues south along the lake and through Jackson Park. North of Ohio street the drive runs along or near the lake to Evanston. At Randolph street there is a viaduct which now consists of four lanes for traffic, leading from the Outer Drive to Michigan avenue. There is a sidewalk on each side of the roadway of the Drive.

Defendant constructed on each side of the viaduct ornamental balustrades, railings and pilasters from Ohio to Randolph street. As stated by counsel for plaintiff, ''As a part of the general design and construction of the viaduct and bridge, a certain plaza was worked in the design of the bridge, which plaza forms a half circle on each side'' of the viaduct near the river. ''Plaintiff's property abuts the west side of the viaduct and the north west side of the plaza.''

Before the improvement was begun a condemnation suit was brought and a stipulation entered in that case whereby $1,500,000 was paid to the property owners, one of which was the lessor of plaintiff. The period covered by the lease is from June 1, 1935, to April 30, 1945, at a rental of $1,333.33 per month. A deed was made of the property conveying the fee simple title by the lessor of that part of the premises where pillars and supports were erected to support the roadway. The air rights as to the balance of the property also passed to the Park Commissioners. In constructing the driveway from the north to the bridge is was necessary to remove a section the width of the improvement, of a large building known as the Pugh Terminal Warehouse which was located a short distance north of the Ogden Slip. On each side of the driveway when completed new fronts were put in the Terminal building and they now abut the roadway on each side with no railings or ornaments in front of

them so that there is access to these buildings on each side of the roadway.

For a number of years plaintiff has conducted a coal business on the ground near the mouth of the Chicago River, extending from the river on the south to the Michigan Canal or Ogden Slip on the north, a distance of several hundred feet, part of which property is underneath the viaduct of the driveway. Plaintiff's business office was at 10 South La Salle street and he desired to construct a building on the property west of the roadway and north of the river where he could display his products and conduct his coal business. Underneath the north approach are railroad tracks which are in use. Before the construction of the viaduct and since, plaintiff has conducted his coal business by driving over east North Water street, an east and west street, and other streets in that vicinity. In making the improvement defendant constructed two stairways from the ground up to the roadway, a distance of 38 feet, one on the west and one on the east side of the roadway so that one could walk up and down these stairways.

The evidence shows that in June 1937, plaintiff had a conversation with Mr. Donoghue the superintendent in charge of defendant, Chicago Park District, at which time he told Donoghue the kind of building he intended to construct. This was before the work of the improvement was completed and before any obstructions were made in front of plaintiff's property. Plaintiff again saw Donoghue in July and August 1937, talked on the same subject and Donoghue again stated the Park Board would want any building constructed to conform with the general contour, outline and architecture of the bridge. The work, including the balustrades, etc., in front of plaintiff's property, was completed about September 1937. No action was taken by the Park Board after the conversation between plaintiff and Mr. Donoghue—the matter was not

taken up with the Park Commissioners. But in November 1937, plaintiff obtained a permit from the City of Chicago for the erection of the building on the west side of the Drive and north of the River which was to extend two stories above the roadway in front of his property. It was to be supported by a number of pillars or posts extending from the ground up to the roadway or viaduct. The foundations were put in and steel work erected for the support of the building below the roadway at an expense of about $15,000. Plaintiff began the work shortly after he obtained the permit and continued until January or February 1938, when it became apparent defendant would not remove the railings and balustrades in front of the proposed building. The building when completed would represent an investment of about $60,000.

Defendant offered evidence that it had been put to an expense in building the ornamental balustrades in front of plaintiff's property of $2,959.85 and $16,926.05, which counsel for defendant says was for "ornamental piers and spandrels, which the park district engineers testified would not have been necessary had plaintiff asserted his rights promptly," and that to remove the balustrades and pier tops to the sidewalk level would cost $2,771.

Plaintiff contends that "The Outer Drive, including the bridge and its approaches . . . is a public highway, boulevard or street for all purposes, and particularly in the sense that abutting property owners are entitled to ingress and egress to their property from the Drive,"—while defendant's position is as stated by its counsel, "The Outer Drive bridge is not a public highway so as to afford abutting owners the right of ingress and egress."

We think this is the controlling point in the case and its solution is not free from difficulty. The driveway in question was constructed by defendant, Chicago Park District, by virtue of the statutes of this State.

Counsel for plaintiff say, "There is no question but that the Park District can invoke regulatory powers in connection with park property under its jurisdiction. We concede that it can establish needful rules and regulations for the government of parks, boulevards and driveways under its jurisdiction, that it may exclude all objectionable travel and traffic, and may enforce reasonable traffic and other regulations." But they contend defendant has no power to exclude abutting property owners from all access to boule vards under its jurisdiction. That thousands of automobiles use the Outer Drive—viaduct and bridge across the river and its approaches—daily in passing from the North to the South side and from the South to the North side. Other thousands living on the North side and in the suburbs north of Chicago also use it to drive into the Loop by way of the Randolph street viaduct and other streets a few blocks south of Randolph street for business purposes.

The Lincoln Park Commissioners (who controlled Lincoln Park prior to the passage of the law authorizing the turning over of the parks to defendant, Chicago Park District) in proceedings authorizing the construction of the improvement, passed a resolution, part of which is: "WHEREAS, The Commissioners of Lincoln Park adopted a resolution on February 14, 1929, to construct one-half of a bridge across the Chicago River and an approach or approaches to the north end of said bridge, which approaches include a bridge over the Michigan Canal, otherwise known as the Ogden Slip, thus forming an elevated boulevard or thoroughfare running southerly from the intersection of Lake Shore Drive and East Ohio street to the north bank of the Chicago River, and connecting Lincoln Park and the boulevards under the control of The Commissioners of Lincoln Park with the boulevards under the control of the South Park Commissioners, which said proposed elevated boulevard or thoroughfare is

commonly known as the Lincoln Park Outer Driveway, . . . and . . . have instituted a condemnation suit for the purpose of acquiring the real estate necessary."

The driveway from the time of its completion has been open to the public, may be used by anyone and it is used daily by thousands of citizens of Chicago and suburbs in going to and from their places of business. We think it is a public highway. *People v. County of Westchester,* 282 N. Y. 224; *Chicago Park District v. Canfield,* 370 Ill. 447; *Anzalone v. Metropolitan Dist. Commission,* 257 Mass. 32; *Goodfellow Tire Co. v. Commissioner of Parks & Boulevards of Detroit,* 163 Mich. 249.

In the *Westchester* case, the Park Commissioners attempted to collect tolls from persons using the parkway which had been constructed by them. In the opinion the Court of Appeals of New York said: "That parkway consists of a four-lane roadway for vehicular traffic, two lanes moving in each direction, and extends through the county of Westchester in a northeasterly direction for a distance of some 16 miles. The roadway has been so constructed, by means of bridges, underpasses, overpasses and traffic circles, as not to cross at grade any highway or other public road or the right of way of any public utility. Certain portions of the parkway consisting of direct continuations and extensions thereof at either end, constructed in similar manner, extending into the city of New York at the southerly end and to the boundary line between the States of New York and Connecticut at the northerly end and there connecting with the Merritt Parkway extending into the State of Connecticut, were constructed. . . . These extensions total three and seven-tenths miles in length and are maintained by the Westchester County Park Commission." The board of supervisors of the county adopted a local law providing for the collection of tolls on the Hutchinson River Parkway. The State of New York contended

there was no authority to collect the tolls. Continuing the court stated that one of the questions was "whether the Hutchinson River Parkway is a public highway" and said the statutes defined what constituted a public highway as follows: " 'Public highway' shall include any highway, road, street, avenue, alley, public place, public driveway or any other public way.' . . . *Elliott on Roads and Streets,* in section 3, page 4, gives the test for determining when a way is a highway, as follows: 'If a way is one over which the public have a general right of passage, it is, in legal contemplation, a highway, whether it be one owned by a private corporation or one owned by the government, or a governmental corporation, and whether it be situated in a town or in the country. No matter whether it be established by prescription or by dedication, or under the right of eminent domain, it is a highway if there is a general right to use it for travel.' " The court then refers to the four-lane roadway and says it is "clearly a highway. Landscaping the right of way does not make 'an ordinary park' out of what is essentially a highway. . . .

"Indeed, the contention that the Hutchinson River Parkway is not a public highway would not be claimed to be serious except for the decision in *Matter of County of Westchester (Hutchinson River Parkway)* (246 N. Y. 314), where this court decided that this very parkway was not a 'street, avenue, highway, or road' within the meaning of section 90 of the Railroad Law." The court held the law (passed by the board of supervisors, which purported to authorize the collection of tolls) was in conflict with the general law of the State and invalid.

In the *Canfield* case (370 Ill. 447), Canfield was charged with violating an ordinance passed by the Chicago Park District (defendant in the instant case) which prohibited driving, in the park system, of a vehicle upon which was displayed commercial adver-

tisement. On hearing he was discharged and on a direct appeal to the Supreme Court the judgment was affirmed. The court there referred to section 7 of the act creating the Chicago Park District approved in 1933 (Ill. Rev. Stat. 1939, ch. 105, par. 333.7 [Jones Ill. Stats. Ann. 96.557.]) and said that the power to regulate traffic or to exclude it is vested in the State but may be delegated as a part of the police power where its exercise bore some relation to public health and safety and which made for public welfare, and that the ordinance was unreasonable. Continuing the court said: ''The issue here presented falls under two principal heads: May appellant exclude vehicular advertising from the parks, and, may such advertising be excluded from the boulevards connecting the public parks, which boulevards are under the jurisdiction of the Chicago Park District? Much of appellee's argument is devoted to the latter phase of this question. He insists that sixty-five per cent of the travel of the city goes over these connecting boulevards, and that it is not a proper regulation to keep automobiles, bearing advertising signs or placards from traveling over them. While this question is one of grave doubt because of the fact these connecting boulevards are, after all, public highways, and do not bear exactly the same relation to the park purposes as the boulevards lying within the public parks, . . . .'' So in the instant case we think the Outer Drive, although it is a connecting boulevard is after all, a public highway and does not bear ''exactly the same relation to the park purposes as the boulevards lying within the public parks.''

In the *Anzalone* case (257 Mass. 32), plaintiff filed a petition for a writ of mandamus to require the Metropolitan District to grant permission for the right of entrance from the park property to his premises. ''One of the purposes for which the right of entrance is sought by the petitioner is for the use of automobiles

resorting to a gasoline filling station upon a part of his premises.'' The application was refused ''solely because the way was intended in part for access to a gasoline filling station.'' The court continuing said: ''The question presented is not whether the proposed entrance is at an appropriate place or of a proper width or construction, but whether the petitioner can be deprived of any access to his property from the roadway because the entrance would be used to some extent in connection with the business conducted on his premises. The provisions of the deed do not prevent the petitioner from using the restricted area for going to and from his gasoline station constructed on the part which is not restricted.

''The roadway in question was constructed by the Commonwealth . . . and is a public way. . . . Access to a public way is one of the incidents of ownership of land bounding thereon, and this right is appurtenant to the land and exists when the fee of the way is in the municipality as well as when it is in private ownership. . . .

''The easement of access in the petitioner was not created by the deed to the Commonwealth but by the later conveyance to him of land to which the easement was appurtenant, and the decisions holding that a reservation of a right of way in a deed does not create an easement for the benefit of a stranger to the deed have no bearing on the case. . . .

''The rule of the respondents relating to entering or leaving the Parkway by regular designated entrances was not intended to take away property rights, in the discretion of the commission. If construed to mean that under it the commissioners may in their uncontrolled discretion take away from abutting owners their easement of access to a roadway the rule would be void. . . .

''The respondents' duty was to grant a way of access upon the petitioner's application subject to such

reasonable regulations and requirements as to location, construction and use as it deemed to be necessary for the public safety and convenience. See *Goodfellow Tire Co. v. Commissioners of Parks & Boulevards of Detroit,* 163 Mich. 249.'' The writ was awarded.

In *Commissioners of Parks & Boulevards of Detroit,* 163 Mich. 249 (referred to with approval in the *Anzalone* case ), it was held that the owner of property abutting on a boulevard has ordinarily a right of ingress and egress to and from his property, and that the commissioners were not warranted in denying the application of an abutting property owner to construct a driveway across his property to the boulevard. The court there referred to Dillon on Municipal Corporations and said: ''Our attention has not been called to a case holding that an abutting owner might be deprived of ingress and egress by means of a driveway to and from his property to the highway in front of it. Certainly, when the legislature, in 1879, gave to the commissioners authority 'to make all reasonable rules and regulations concerning the use of said boulevard,' no one supposed they might deny the right of the abutting owner to construct a driveway to the boulevard.''

In the instant case, so far as we are advised by the record or briefs, nothing was said or done in the condemnation proceedings brought to acquire the property, touching the question of the right of plaintiff of ingress or egress to the roadway of the Outer Drive and it is held that such right need not be reserved by deed or otherwise but is a right appurtenant to the abutting property owner, and an incident of such ownership. *Anzalone v. Metropolitan Dist. Commission,* 257 Mass. 32.

In support of defendant's contention that the Outer Drive is not a public highway, its counsel cite the statutes of this State, the decisions of our Supreme

Court and cases from Massachusetts, New York and Michigan, and other States, but we think none of the cases is in point and the statutes do not cover the point in question. We think the law of Massachusetts, Michigan and New York on the question involved is as announced in the cases hereinbefore discussed.

In *Burke v. Metropolitan Dist. Commission,* 262 Mass. 70, one of the cases cited by counsel for defendant, a petition for writ of mandamus was filed by the property owner seeking to compel the commissioners to grant a permit for two driveway openings in Memorial Drive 25 feet wide so as to afford a way to and from a gasoline filling station located on his property. The prayer of the petition was denied, the court saying: "Roads and boulevards, built under authority of St. 1894, c. 288 (G. L. c. 92, sec. 35), have been held to be public ways" [citing a number of Massachusetts cases including the *Anzalone* case above discussed]. Continuing the court said: "But roadways constructed as a part of public parks, by park commissioners acting under the general authority conferred by St. 1893, c. 407 (G. L. c. 92, sec. 33), and amendments thereof, are not public ways, but an integral part of the park or open space for recreation. . . .

"The roadway in question was to be constructed by the city of Cambridge within the park, and as a part of its park system." The writ was denied.

We think the opinion in that case in no way modifies the *Anzalone* case. In that case, as the court said, the driveways were to be within the park. "The driveways petitioned for would pass over a sidewalk and cut through an adjacent strip of grass or lawn in which trees have been planted. One of these trees is in the proposed location of one of the driveways."

The cases cited from Illinois, such as *People v. Chicago Motor Bus Co.,* 295 Ill. 486 (which held that the Lincoln Park Commissioners were authorized to

require the bus company to pay for using the streets under the jurisdiction of the commissioners), and *LePitre v. Chicago Park District,* 374 Ill. 184 (which held the District was not liable in damages for negligence which resulted in personal injuries) are not in point.

Counsel for defendant further contend that the "present means of ingress and egress enables plaintiff to have full access to his property and is reasonable and sufficient," and that "The construction of the Outer Drive bridge did not take away any means of ingress or egress that existed prior thereto, nor confer any such right upon plaintiff."

Holding as we do, that the Outer Drive is a public highway and that plaintiff has a right of ingress and egress, the points urged are not of controlling importance. As stated, there are two buildings now abutting on the roadway of the Drive, one on the east side and the other on the west side which have direct access to the Drive. We think it unreasonable for defendant to say that plaintiff has no such right. He ought to be permitted to construct his building in a proper manner considering all the surrounding circumstances and be permitted to conduct his business so as not to unreasonably interfere with the use of the drive.

Defendant contends plaintiff was guilty of laches in failing to take court action to assert his rights while the bridge was in the course of construction citing *Brandenburg v. Country Club Bldg. Corp.,* 332 Ill. 136, and other cases. We think the facts in that case are not applicable to the facts in the case at bar. There a large apartment building was being constructed in violation of building restrictions. Plaintiff lived nearby and the court said: "The complainant, with knowledge of this work as it progressed, expressed no dissatisfaction and made no protest." In the case at bar, plaintiff took the matter of the construction by him of a proposed building up with

the Superintendent of Parks before the work had progressed very far—before any balustrades were constructed in front of his property, and told the superintendent he desired access to the building when constructed.

A case more nearly in point is *Gerstley v. Globe Wernicke Co.*, 340 Ill. 270, where a bill was filed for a mandatory injunction to compel the removal of certain bridges built across an alley. The question of laches was discussed and it was held that a mandatory injunction was warranted.

We are not impressed by the witness who testified for defendant that if it had been known plaintiff was to construct a building such as proposed and had brought suit, the expenditure of $16, 926.05 for ornamental piers and spandrels would have been unnecessary. But in any event we think laches is not a defense under the facts in the instant case.

For the reasons stated, the decree of the superior court of Cook county is reversed and the cause remanded with directions to award a mandatory injunction as prayed for in the complaint.

*Reversed and remanded with directions.*

McSURELY, P. J., and MATCHETT, J., concur.